IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David D. Ritter,                          :
                    Appellant             :
                                          :   No. 1322 C.D. 2021
          v.                              :
                                          :   Submitted: December 8, 2021
Lehigh County Board of Elections          :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                        FILED: January 3, 2022


          David D. Ritter (Ritter), a candidate for a judgeship on a court of
common pleas, initiated a statutory appeal under the Pennsylvania Election Code[1]
(Election Code) in the Court of Common Pleas of Lehigh County (trial court) from a
decision by the Lehigh County Board of Elections (Board) to canvass and count 261
mail-in ballots for the November 2, 2021 Municipal Election (Municipal Election).
"Of the 261 ballots at issue, 257 ballots contain no date at all on the return envelope
and 4 ballots contain a date on the return envelope but not on the line designated for
that purpose on the envelope."  (Trial court op. at 2.)   The trial court affirmed the
Board's decision in an order and opinion dated November 30, 2021.

_____

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§2600-3591.

Briefly, by way of background, in October 2019, the General Assembly enacted Act 77 of 2019, which amended the Election Code and authorized "mail-in voting"—also known as no-excuse absentee voting—for the first time in Pennsylvania. *See generally* Act of October 31, 2019, P.L. 552, No. 77, 25 P.S. §§3150.11-3150.17. Pursuant to this statute, each county board of election, among other things, is required to provide the mail-in ballot elector with two envelopes—an inner secrecy envelope in which the executed ballot is placed and an outer mailing envelope in which the secrecy envelope, containing the executed ballot, is placed for mailing. *See* section 1304-D of the Election Code, 25 P.S. §3150.14. The outer mailing envelope must include an elector declaration and the name and address of the proper county board of elections. 25 P.S. §3150.14(a).

Reproduced in full, section 1306-D(a) of the Election Code, setting forth the procedure for the submission of a mail-in ballot, states:

> (a) General rule.--At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Mail-in Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. **The elector shall** then fill out, **date** and sign **the declaration printed on such envelope**. Such envelope shall then be securely sealed and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

25 P.S. §3150.16(a) (emphasis added).

2

Upon review, we conclude that the 257 ballots that do not contain a date must be set aside and not counted in the Municipal Election. Because the remaining 4 ballots will not have an impact as to whether Ritter obtained enough votes to be elected to a judgeship, we decline to determine their validity or invalidity under the Election Code. Accordingly, we reverse the order of the trial court and remand to the trial court to issue an order sustaining Ritter's challenge to the Board's determination and directing the Board to exclude the 257 ballots from the certified returns of the Municipal Election.

## Background

The trial court summarized the facts of this case as follows:

Among other contests in the [] Municipal Election [] was the election of three judges to its court of common pleas. The latest computation of votes is that the candidate with the third most votes, [] Ritter, is 74 votes ahead of the candidate with the fourth most votes, Zac Cohen.

. . . .

All of the 261 ballots were signed and cast by qualified electors and received timely by the Board. The receipt date of each of the 261 ballots is verifiable without the date filled-in by the elector. None of the electors of the 261 ballots at issue appeared at the polls to vote twice. Other than not including the date, or including it in the wrong place, on the return envelope, there is no evidence of fraud or misconduct associated with any of the 261 ballots.

Approximately 22,000 votes were cast in Lehigh County in the [Municipal] Election. The 261 ballots at issue represent approximately 1.14% of the total votes cast.

. . . .

[T]he sole issue before the court focuses on the statutory language "**[t]he elector shall** then fill out, **date** and sign **the declaration** printed **on such** [*i.e.*, the outer, "return"] **envelope**." [Section 1306-D(a) of the Election Code,] 25 P.S. §3150.16(a) [(emphasis added)].

(Trial court op. at 1, 6-7.)

In its opinion, the trial court surveyed the three legal positions taken by the Supreme Court in a fractured, plurality opinion, *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, 241 A.3d 1058 (Pa. 2020) (opinion announcing the judgment of the court) (hereinafter "*In re Canvass of Absentee and Mail-In Ballots*").[2]  In that case, the Supreme Court was presented with, among other issues, "the question of whether the Election Code requires a county board of elections to disqualify mail-in [] ballots submitted by qualified electors who signed the declaration on their ballot's outer envelope but did not handwrite [the] date, where no fraud or irregularity has been alleged." *Id.* at 1062 (hereinafter the "undated mail-in ballots").  In short, Justice Donohue authored the lead opinion or Opinion Announcing the Judgment of the Court (hereinafter the "OAJC"), which was joined by now-Chief Justice Baer and Justice Todd, and concluded, in pertinent part, that a county board of elections does not have to disqualify undated mail-in ballots. Speaking for three Justices, Justice Dougherty, joined by then-Chief Justice Saylor and Justice Mundy, wrote a concurring and dissenting opinion, in which he disagreed with the OAJC on the undated mail-in ballots issue, concluding instead that such

_____

[2] In *In re Canvass of Absentee and Mail-In Ballots*, a majority of our Supreme Court reversed this Court's unreported decision in *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election* (Pa. Cmwlth., No. 1162 C.D. 2020, filed November 19, 2020) (unreported), which was authored by then Judge—now President Judge—P. Kevin Brobson.  We mention this fact because Supreme Court referenced Judge Brobson by name, and, in notable part, reproduced his analysis, in its opinion.

4

ballots are invalid and should not be counted (hereinafter the "CDO Opinion"). Justice Wecht concurred in the result of the OAJC and filed a concurring and dissenting opinion, and, in the dissenting portion of that opinion, he expressed the view that undated mail-in ballots were invalid (hereafter the "CIR Opinion"); nonetheless, Justice Wecht declined to employ this rule to the then-present case, *In re Canvass of Absentee and Mail-In Ballots*, and deferred its application to future elections.

Ultimately, the trial court adopted and applied the reasoning and result of the OAJC to arrive at its conclusion that the undated mail-in ballots must be counted. In so doing, the trial court expounded upon the rationale of the OAJC in determining that the legal position of the OAJC was, on balance, more persuasive than that of the CDO Opinion and the CIR Opinion. *See* Trial court op. at 12-14, 16-17. Moreover, the trial court noted that the four Justices, those that comprised the OAJC and the CIR Opinion, were concerned about—but did not rule upon—the applicability of section 10101(a)(2)(B) of the federal Voting Rights Act,[3] which generally prohibits a State from denying an individual's right to vote for "immaterial reasons." 52 U.S.C. §10101(a)(2)(B). However, the trial court never made an express determination that the Voting Rights Act would be violated if the undated mail-in votes were not counted in the Municipal Election. *See* Trial court op. at 14-15.

## Discussion

Because "[t]he integrity of the election process requires immediate resolution of disputes that prevent certification," *In re 2003 Election for Jackson*

---

[3] 52 U.S.C. §§10101-10702, *formerly* set forth at 42 U.S.C. §1971.

5

*Township Supervisor*, 840 A.2d 1044, 1046 (Pa. Cmwlth. 2003) (Kelley, S.J., single-judge opinion), we briefly recount the arguments and various positions of the parties.[4] At bottom, everyone agrees that our Supreme Court has already spoken on the precise issue presented in this case in *In re Canvass of Absentee and Mail-In Ballots*, and the parties and *amicus curiae* advance their respective reasons as to why this Court should adopt or otherwise favor the reasoning of the OAJC, the CIR Opinion, and/or the CDO Opinion.

Initially, we note that as an intermediate appellate court, this Court is required to follow the mandates of our Supreme Court and is duty-bound to effectuate its decisional law. *See Walnut Street Associates, Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 480 (Pa. 2011). At the cornerstone of the debate among the three opinions that constituted *In re Canvass of Absentee and Mail-In Ballots* was whether the term "shall" in the phrase, "[t]he elector shall . . . date . . . the declaration printed on such envelope," was mandatory versus directory and how to differentiate between the two.

The three Justices that constituted the OAJC concluded "that dating the declaration is a directory, rather than a mandatory, instruction, and thus the inadvertent failure to comply does not require that ballots lacking a date be excluded from counting." OAJC, 241 A.3d at 1076. In so deciding, the OAJC "reiterated that the distinction between directory and mandatory instructions applies with respect to a voter's obligations under the Election Code, and that only failures to comply with mandatory obligations, which implicate both legislative intent and 'weighty interests'

---

[4] The Pennsylvania Office of Attorney General has filed an *amicus* brief in support of the trial court's decision, and the Speaker and Majority Leader of the Pennsylvania House of Representatives, and the President Pro Tempore and Majority Leader of the Pennsylvania Senate have filed an *amicus* brief in support of Ritter.

in the election process, like ballot confidentiality or fraud prevention, will require disqualification." *Id.* The OAJC then explained that,

> the inclusion of the word "date" in the statute does not change the analysis because the word "shall" is not determinative as to whether the obligation is mandatory or directive in nature. That distinction turns on whether the obligation carries "weighty interests." The date that the declaration is signed is irrelevant to a board of elections' comparison of the voter declaration to the applicable voter list, and a board can reasonably determine that a voter's declaration is sufficient even without the date of signature. Every one of the [] ballots challenged . . . were received by the boards of elections by 8:00 p.m. on Election Day, so there is no danger that any of these ballots was untimely or fraudulently back-dated. Moreover, in all cases, the receipt date of the ballots is verifiable, as upon receipt of the ballot, the county board stamps the date of receipt on the ballot-return and records the date the ballot is received in the SURE system. The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfl[u]ous.

*Id.* at 1076-77.

The OAJC then rejected the appellant's two assertions of a "weighty interest"—(1) "that the date on which the declaration was signed may reflect whether the person is a 'qualified elector' entitled to vote in a particular election," and (2) "that the date of signature of the declaration will serve to prevent double voting." *Id.* at 1077. Ultimately, the OAJC held "that a signed but undated declaration is sufficient and does not implicate any weighty interest. Hence, the lack of a handwritten date cannot result in vote disqualification." *Id. a*t 1079.

By contrast, the three Justices of the CDO disagreed with the OAJC "that the obligation of electors to set forth the date they signed the declaration on that

7

envelope does not carry 'weighty interests.'" CDO, 241 A.3d at 1090. In reviewing the pertinent statutory language, Justice Dougherty, on behalf of the CDO, opined:

> The meaning of the terms "date" and "sign"—which were included by the legislature—are self-evident, they are not subject to interpretation, and the statutory language expressly requires that the elector provide them. Accordingly, I do not view the absence of a date as a mere technical insufficiency we may overlook.
>
> In my opinion, there is an unquestionable purpose behind requiring electors to date and sign the declaration. As Judge Brobson observed below, the date on the ballot envelope provides proof of when the "elector actually executed the ballot in full, ensuring their desire to cast it in lieu of appearing in person at a polling place. The presence of the date also establishes a point in time against which to measure the elector's eligibility to cast the ballot[.] The date also ensures the elector completed the ballot within the proper time frame and prevents the tabulation of potentially fraudulent back-dated votes. I recognize there is presently no dispute that all undated ballots at issue here arrived in a timely manner. But I am also cognizant that our interpretation of this relatively new statute will act as precedential guidance for future cases.

CDO, 241 A.3d at 1190-91 (internal citations omitted).

The CIR opinion written by Justice Wecht essentially served as a tie-breaker in the case. Unlike the OAJC and the CDO, both of which engaged, to some extent, in a "weighty interest" or "materiality" analysis, the CIR, citing his previous stance on the issue, restated his "increasing discomfort with [the] Court's willingness to peer behind the curtain of mandatory statutory language in search of some unspoken directory intent." CIR, 241 A.3d at 1080. The CIR opined that if the Supreme Court is "to maintain a principled approach to statutory interpretation that

comports with the mandate of our Statutory Construction Act [of 1972],[5]" and "maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect," then the Court "must read mandatory language as it appears" and "recognize that a mandate without consequence is no mandate at all." *Id.* The CIR expressed the view that

> [a] court's only 'goal' should be to remain faithful to the terms of the statute that the General Assembly enacted, employing only one juridical presumption when faced with unambiguous language: that the legislature *meant what it said.* And even where the legislature's goal, however objectionable, is to impose a requirement that appears to have a disenfranchising effect, it may do so to any extent that steers clear of constitutional protections.

*Id.* at 1082 (emphasis in original). Further, noting "the difficulties endemic to judicial efforts to discern ulterior meanings ostensibly obscured by the legislature's use of mandatory language," the CIR "observed that relying upon such unbounded investigations invited courts to bend unclear texts toward whatever ends that they believe to be consonant with legislative intent, but with little or no contemporaneous insight into whether they have done so successfully." *Id.* at 1084 (internal citation and quotation marks omitted).

From this line of judicial thought, the CIR stated that, with respect to the undated mail-in ballots, the "the date [] requirement [] derives from an unmistakable statutory directive." *Id.* at 1085. The CIR then went on to criticize the OAJC as follows:

> Drawing upon our less rigorous case law, and relying heavily upon the interpretive latitude this Court has arrogated to itself sporadically for generations, the OAJC

---

[5] 1 Pa.C.S. §§1501-1991.

9

assumes that our mission is to determine whether the apparent mandate is in fact directory, hanging the entire inquiry upon the question of mandatory versus directory effect. That reading, in turn, must rely upon the "minor irregularity"/"weighty interest" dichotomy underlying the cases that [recent Supreme Court precedent] have called into question.

. . . .

[T]he OAJC involves protean characterizations of voting requirements as "technicalities," "minor irregularities," and even "superfluous." As illustrated in my review of earlier case law, the OAJC does not conjure this terminology from the ether—all but the last of these terms have been central to this Court's decisional law going back decades. But properly understood, all of these terms signal (and implicitly bless) the substitution of judicial appraisals for legislative judgments.

The OAJC's approach ultimately requires that in *any* case requiring interpretation of the Election Code to determine the validity of votes nonconforming with facially mandatory requirements, the Court must assess the effect of that language *de novo* before deciding whether the legislature intended for it to be interpreted as mandatory or merely directory. Thus, while a court embracing that test might take it as obvious, *e.g.,* that the signature requirement should be construed as mandatory, it could not merely have taken its mandatory effect as a given by virtue of the statutory language alone. If the mandatory/directory inquiry is ever appropriately applied to mandatory language, then the Court can only conclude that mandatory language must be applied as such after applying its balancing test, with cases that *seem* obvious merely reflecting that the Court deemed the "interest" to be protected so "weighty" that its omission clearly cannot be viewed as a "minor irregularity."

*Id.* at 1085-87 (footnotes omitted; emphasis in original).

The CIR continued,

I do not dispute that colorable arguments may be mounted to challenge the necessity of the date requirement, and the OAJC recites just such arguments. But colorable arguments also suggest its importance, as detailed in Judge Brobson's opinion as well as [the CDO]. And even to *indulge* these arguments requires the court to referee a tug of war in which unambiguous statutory language serves as the rope. That reasonable arguments may be mounted for and against a mandatory reading only illustrates precisely why we have no business doing so.

*Id.* at 1087 (footnotes omitted; emphasis in original). To reconcile this dilemma, the CIR posited that "[t]he only practical and principled alternative is to read 'shall' as mandatory" for this would "restore to the legislature the onus for making policy judgments about what requirements are necessary to ensure the security of our elections against fraud and avoid inconsistent application of the law, especially given the certainty of disparate views of what constitute 'minor irregularities' and countervailing 'weighty interests.'" *Id.*

The CIR further "agree[d] with Judge Brobson's description of the greatest risk that arises from questioning the intended effect of mandatory language on a case-by-case basis," and quoted from his opinion from this Court:

While we realize that our decision in this case means that some votes will not be counted, the decision is grounded in law. It ensures that the votes will not be counted because the votes are invalid as a matter of law. Such adherence to the law ensures equal elections throughout the Commonwealth, on terms set by the General Assembly. The danger to our democracy is not that electors who failed to follow the law in casting their ballots will have their ballots set aside due to their own error; rather, the real danger is leaving it to each county board of election to decide what laws must be followed (mandatory) and what laws are optional (directory), providing a patchwork of unwritten and arbitrary rules that will have some defective ballots counted and others discarded, depending on the

11

county in which a voter resides.  Such a patchwork system does not guarantee voters an "equal" election, particularly where the election involves inter-county and statewide offices.  We do not enfranchise voters by absolving them of their responsibility to execute their ballots in accordance with law.

Id. at 1087 (internal citations and footnotes omitted).

To finalize his point, the CIR said that "the Election Code should be interpreted with unstinting fidelity to its terms, and that election officials should disqualify ballots that do not comply with unambiguous statutory requirements, when determining noncompliance requires no exercise of subjective judgment by election officials," and stated that "[t]he date requirement here presents such a case." *Id.* at 1089.  Yet, the CIR was concerned with invalidating the undated mail-in ballots in the 2020 General Election because, given the novelty of Act 77 and mail-in voting during the COVID-19 pandemic, he "[could not] say with any confidence that even diligent electors were adequately informed as to what was required to avoid the consequence of disqualification," and, thus, "it would be unfair to punish voters for the incidents of systemic growing pains." *Id.* at 1089.

From all of this, the penultimate conclusion of the CIR was as follows:

I part ways with the conclusion reflected in the [OAJC] that a voter's failure to comply with the statutory requirement that voters date the voter declaration should be overlooked as a "minor irregularity."  This requirement is stated in unambiguously mandatory terms, and nothing in the Election Code suggests that the legislature intended that courts should construe its mandatory language as directory. Thus, **in future elections, I would treat the date and sign requirement as mandatory in both particulars, with the omission of either item sufficient without more to invalidate the ballot in question**. **However, under the circumstances in which the issue has arisen, I would apply my interpretation only prospectively**.  So despite

12

> my reservations about the OAJC's analysis, I concur in its disposition[.]

*Id.* at 1079-80 (internal citations and quotation marks omitted; emphasis added).

This Court does not take the decisions of our Supreme Court lightly, especially, where, as here, our High Court just recently issued an opinion that directly addressed a legal issue that, in legalese, is on "all fours" with the facts of this case. That said, although *In re Canvass of Absentee and Mail-In Ballots* is technically a plurality opinion, we must nonetheless decide whether it has attained precedential value. *See Walnut Street Associates, Inc.*, 20 A.3d at 480. Significantly, the CIR, despite concurring in the result of the OAJC, rejected the conclusion and legal reasoning of the OAJC with respect to the undated mail-in ballots. Instead, the CIR determined, consistent with the CDO, that the undated mail-in ballots were invalid and must be stricken in all elections after 2020, including the present one. As such, a majority of the Justices (4 of them) in *In re Canvass of Absentee and Mail-In Ballots* generally agreed that—at least in this point in time—the undated mail-in ballots must be set aside. *See In re T.S.*, 192 A.3d 1080, 1088 (Pa. 2018) (explaining how, in a fractured plurality opinion, the rationale expressed by two Justices in a concurring opinion and two Justices in a concurring and dissenting opinion combined together to form a majority of Justices and a controlling principle of law). In other words, for present purposes, the CDO reflects the majority view of the Supreme Court with respect to the question of law at issue in this case. For one of two reasons, or for both, we conclude that the CDO, in conjunction with the CIR, should be considered

13

as precedential authority that is binding on this Court and controls the outcome of this case.[6]

Broadly speaking, a plurality opinion issued by our Supreme Court may be precedential and binding on lower courts, among other ways, under the doctrine of (1) "result" *stare decisis* and/or (2) "false plurality" analysis. *See Commonwealth v. McClelland*, 233 A.3d 717, 730 (Pa. 2020).

First, in describing "result" *stare decisis*, the United States Court of Appeals for the Third Circuit explained:

> [I]t seems clear that lower courts must adhere at the minimum to the principle of 'result' stare decisis, which mandates that any specific result espoused by a clear majority of the Court should be controlling in substantially identical cases. The absence of a clear majority rationale supporting the result may give a lower court some flexibility to formulate a justifying rule[;] it does not, however, justify a court in embracing a line of reasoning that will lead to a contrary result. . . . Adherence to 'result' *stare decisis* is essential if principles of certainty and uniformity are to have any meaning at all.

*Rappa v. New Castle County*, 18 F.3d 1043, 1061 n.26 (3rd Cir. 1994) (internal citation omitted); *see Anker Energy Corp. v. Consolidation Coal Company*, 177 F.3d 161, 170 (3d Cir. 1999) ("[T]he only binding aspect of a splintered decision is its specific result."). In some cases, our Supreme Court appears to have adhered to this view. *See Commonwealth v. Bethea*, 828 A.2d 1066, 1073 (Pa. 2003) ("When a court is faced with a plurality opinion, usually only the result carries precedential weight; the reasoning does not."); *Commonwealth v. Haefner*, 373 A.2d 1094, 1095 (Pa.

---

[6] Of course, our Supreme Court has sole authority to decide whether, or to what extent, its previous opinions possess precedential value because only that Court, alone, may overrule its precedent.

14

1977) (stating that, in a plurality opinion, where a majority of the Justices of the Supreme Court agree in a result, the result of the decision is precedential); *see also Finnegan v. Pennsylvania Board of Probation and Parole*, 838 A.2d 684, 687 & n.2 (Pa. 2003). Here, while the CDO and the CIR employed different legal reasoning to obtain their respective conclusions, the ultimate holding of both the CDO and the CIR, as mentioned directly above, was that the undated mail-in ballots were invalid. Because 4 Justices clearly agree on this result, that result, no matter what legal reasoning was used to support it, should be deemed as precedential and binding on this Court under the rule of "result" *stare decisis*.

Second, in what has been described as the "false plurality" doctrine, a majority agreement among the Justices may be deduced from the rationales of the fragmented opinions. As one commentator stated:

> The key characteristic that makes plurality decisions troublesome is the presence of at least two distinct rationales that will justify the result reached in a case, neither of which commands a majority. In some cases that are nominally plurality decisions, however, a majority of the Court does support a rationale sufficient to justify the holding. Such cases take the form of plurality decisions only because some justices go on to state additional ideas. Thus, when proposition *A* is sufficient to justify the holding, and either the plurality opinion supports *A* while the minority opinion supports both *A* and *B,* or the plurality opinion supports *A* and *B* while the minority opinion supports *A*, a 'false plurality' decision results.

*Plurality Decisions and Judicial Decision Making,* 94 HARV. L. REV. 1127 (1981).

Here, based upon our reading, the CDO reached its conclusion based on (*A*) the mandatory language of the statute, and (*B*) the affirmative weighty interests that support reading the language as mandatory. In contrast, the CIR reached its conclusion based on (*A*) the mandatory language of the statute. Notably, there is a

passage in the CDO suggesting that that the mandatory language of the statute, in and of itself, would be enough to support its conclusion and that the weighty interests analysis was merely an additional rationale used to refute the OAJC. *See* CDO, 241 A.3d at 1090 ("[T]he meaning of the terms 'date' and 'sign'—which were included by the legislature—are self-evident, they are not subject to interpretation, and the statutory language expressly requires that the elector provide them. *See In re Canvass of Absentee Ballots of Nov. 4, 2003 General Election*, 843 A.2d 1223, 1231 (Pa. 2004) ("[A]ll things being equal, the law will be construed liberally in favor of the right to vote but, at the same time, we cannot ignore the clear mandates of the Election Code.") (citation omitted). Accordingly, I do not view the absence of a date as a mere technical insufficiency we may overlook."); CDO, 241 A.3d at 1090 ("I cannot agree [with the OAJC] that the obligation of electors to set forth the date they signed the declaration on that envelope does not carry 'weighty interests.'"). Consequently, it appears that the CIR is the "narrowest ground" of the various opinions in *In re Canvass of Absentee and Mail-In Ballots*, and being "a logical subset of the other, broader opinion," *i.e.*, the CDO, represents "a common denominator of the Court's reasoning." *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (*en banc*).[7] Therefore, we conclude that the CIR should be viewed as binding authority on this Court. *See McClelland*, 233 A.3d at 732-33 (concluding that a

---

[7] This conclusion is buttressed by the fact that the CIR, notwithstanding all of the language in the opinion emphasizing the mandatory nature of the word "shall," specifically couched its conclusion with explicit reference to the absence of legislative intent to the contrary. *See* CIR, 241 A.3d at 1079 ("[T]he statutory requirement that voters date the voter declaration should be overlooked as a 'minor irregularity.' This requirement is stated in unambiguously mandatory terms, and nothing in the Election Code suggests that the legislature intended that courts should construe its mandatory language as directory."). Thus, while the CDO found that legislative intent constituted an *affirmative* "weighty interest" to construe "shall" as mandatory, the CIR seemingly noted the *absence* of such intent.

previous case was precedential where the three-Justice plurality or lead opinion determined that hearsay could not establish a *prima facie* case at the preliminary hearing stage as a violation of both due process and the right to confrontation, and the concurring opinion reached the same conclusion based on a violation of due process, but not as a violation of the right to confrontation, because a majority of the Justices held that "hearsay alone is insufficient to establish a *prima facie* case at a preliminary hearing because to do so violates principles of fundamental due process.").

In the alternative, assuming that the collective result of the CDO and the CIR are not binding, or the reasoning of the CIR is not precedential, we conclude that either the CDO or the CIR is the most persuasive of the opinions and that one or the other should be adopted by this Court as such. To begin, we reiterate that, at this moment, a majority of the Justices agree the undated mail-in ballots are invalid. Although the rationale of the CDO and the CIR may differ, they are not worlds apart and, in a theoretical sense, complement and are compatible with another. *See supra* n.7. Considering the opinions, it is evident that the CDO represents a universally applicable, yet implicitly, shared common ground of legal reasoning between the two. This is because, in every situation in which the CDO would determine that the word "shall" should be read as mandatory, the CIR would necessarily reach the same conclusion. Therefore, given the substantial overlap in their reasoning, it is difficult for this Court to disregard the expressed conclusion enunciated by a majority of the Justices in the CDO and the CIR, who have recently decided the exact same issue presented in this case. Instead, we believe that this Court should follow and adopt the will of the majority of the Justices, whether it be the CDO or the CIR.

Moreover, in our view, both the CDO and the CIR effectively discredit the OAJC. In sum, we find that the CDO persuasively explains why there are

17

"weighty interests" that sustain an interpretation of "shall" as mandatory. We further find the CIR provides a compelling critique of the OAJC and the problems associated with construing "shall" in a manner that reflects the proverbial "legislating from the bench," and the ideals inherent in reading the language of statute according to its plain meaning. Therefore, if this Court had (or has) the freedom to choose among the opinions in *In re Canvass of Absentee and Mail-In Ballots*, it would chose either the CIR or the CDO over the OAJC. In so deciding, this Court notes that, as a practical matter, it is not necessary for us to pick one over the other because we are not applying *In re Canvass of Absentee and Mail-In Ballots* to a distinctive statute, let alone to a different provision in the Election Code, and the will of the majority of Justices has been expressed in terms of the validity of the undated mail-in ballots.[8]

Finally, to the extent the parties refer to section 10101(a)(2)(B) of the federal Voting Rights Act, that provision states:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act **requisite** to voting, **if such** error or **omission is not material in determining whether such individual is qualified under State law to vote in such election**.

52 U.S.C. §10101(a)(2)(B) (double emphasis added).

---

[8] In response to the Dissent, the bare and undisputed fact is that a majority of Justices in *In re Canvass of Absentee and Mail-In Ballots* have clearly spoken on the precise issue at bar. As such, this Court is required to follow and adopt the volition of the majority of Justices—not to ignore it or pretend as though a "majority" does not otherwise exist. *See Walnut Street Associates, Inc.*, 20 A.3d at 480 ("It is beyond peradventure that the [Commonwealth] Court must follow this Court's mandates, and it generally lacks the authority to determine that this Court's decisions are no longer controlling."); *Behers v. Unemployment Compensation Board of Review*, 842 A.2d 359, 367 (Pa. 2004) ("We caution the courts below that their task is to effectuate the decisional law of this Court, not to restrict it through curtailed readings of controlling authority.").

Here, the trial court arguably erred in raising the issue of this statutory provision *sua sponte*, and we note that the trial court never actually decided whether it was relevant to the case. Nonetheless, we conclude that section 10101(a)(2)(B) is inapplicable because section 1306-D(a) of the Election Code dictates the validity of a mail-in vote that has been cast by an elector who is otherwise qualified to vote, and does not, in any way, relate to the whether that elector has met the qualifications necessary to vote in the first place. *See Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004); ("Nothing in my review of the case law in this jurisdiction or in other jurisdictions indicates that [section 10101(a)(2)(B)] was intended to apply to the counting of ballots by individuals *already deemed qualified to vote*.") (emphasis in original); *id.* at 1372-73 ("[Section 10101(a)(2)(B)] provides specifically for protections against denials based on errors or omissions on 'records or papers' that are immaterial to the determination of an individual's qualification to vote. The error and omission alleged here did not pertain to determining eligibility to vote."). Further, because this Court has, among other things, adopted the rationale of the CDO as persuasive authority, we conclude that the dating of mail-in ballots is a "material" requisite under the Election Code because it is justified by the "weighty interests" pronounced by Judge Brobson in his opinion from this Court and endorsed by the CDO. As such, section 10101(a)(2)(B) cannot serve as a basis to alter our conclusion in this case.

## Conclusion

For the above-stated reasons, we conclude that the 257 ballots that do not contain a date must be set aside and not counted in the Municipal Election. Accordingly, we reverse the order of the trial court and remand to the trial court to

19

issue an order sustaining Ritter's challenge to the Board's determination and directing the Board to exclude the 257 ballots from the certified returns of the Municipal Election.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David D. Ritter,                :
        Appellant        :
                    :  No. 1322 C.D. 2021
       v.             :
                    :  Submitted: December 8, 2021
Lehigh County Board of Elections  :

## *ORDER*

AND NOW, this 3rd day of January, 2022, the November 30, 2021 order of the Court of Common Pleas of Lehigh County (trial court) is REVERSED and the matter is remanded to the trial court for further proceedings in accordance with the accompanying opinion.

Jurisdiction RELINQUISHED.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David D. Ritter,                 :
                                  :
                Appellant    :
                                    :
         v.                     : No. 1322 C.D. 2021
                                    : Submitted:  December 8, 2021
Lehigh County Board of Elections    :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge

<u>OPINION NOT REPORTED</u>

DISSENTING OPINION
BY JUDGE WOJCIK                 FILED: January 3, 2022


I dissent from the Majority's decision to reverse the order of the Lehigh County Court of Common Pleas (trial court) in this matter.  As the Pennsylvania Supreme Court has explained:

> 'The power to throw out a ballot for minor irregularities, like the power to throw out the entire poll of an election district for irregularities, must be exercised very sparingly and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election except for compelling reasons. * * * 'The purpose in holding elections is to register the actual expression of the electorate's will' and that 'computing judges' should endeavor 'to see what was the true result.'  There should be the same reluctance to throw out a single ballot as there is to throw out an entire district poll, for sometimes an election hinges on one vote.'

In resolving election controversies it would not be amiss to consider the following criteria:

1. Was any specific provision of the Election Code violated?

2. Was any fraud involved?

3. Was the will of the voter subverted?

4. Is the will of the voter in doubt?

5. Did the loser suffer an unfair disadvantage?

6. Did the winner gain an unfair disadvantage?

*Appeal of James*, 105 A.2d 64, 67 (Pa. 1954) (citation omitted). It is undisputed that only the first of the foregoing six criteria is at issue with respect to the contested ballots herein.

The Act of October 31, 2019, P.L. 552, No. 77, added Section 1306-D(a) to the Pennsylvania Election Code (Election Code),[1] which states:

> **(a) General rule.--**At any time after receiving an official mail-in ballot, but on or before eight o'clock P.M. the day of the primary or election, ***the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen***, and then fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed "Official Election Ballot." This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector. ***The elector shall then fill out, date and sign the declaration printed on such envelope***. Such envelope shall then be securely sealed and the elector

---

[1] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §3150.16(a).

shall send same by mail, postage prepaid, except where franked, or deliver it in person to said county board of election.

Emphasis added.

In light of the foregoing statutory requirements, the Majority seeks to disenfranchise 261 registered voters who timely returned their mail-in ballots to the Lehigh County Board of Elections (Board), which ballots were sealed in secrecy envelopes and inserted in sealed outer envelopes containing a declaration that the voters signed, but did not properly date, and which ballots the Board received by 8:00 p.m. on the date of the Municipal Election, November 2, 2021. Unlike the Majority, I do not believe that a "majority" reasoning may be divined from the plurality opinion of the Supreme Court in *In re Cavass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, 241 A.3d 1058 (Pa. 2020), or that such reasoning compels a different result, particularly in light of the recent change to that Court's composition in the 2021 Municipal Election. *See, e.g.*, *In the Interest of O.A.*, 717 A.2d 490, 496 n.4 (Pa. 1998) ("While the ultimate order of a plurality opinion, *i.e.*, an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority.").[2]

---

[2] In footnote 8, the Majority asserts that there is a "bare and undisputed fact" that a majority of the then Supreme Court Justices have "clearly spoken on the issue at bar," ignoring the fact that it took the Majority 13 pages to precisely determine what the Supreme Court's "clear" holding was on this issue in *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*. To the contrary, as outlined above, the Supreme Court's opinion in *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election* is a plurality opinion that does not establish binding precedent on this issue. As the Pennsylvania Supreme Court has explained:

> The United States Supreme Court announced in *Marks v. United States*, 430 U.S. 188 [(1977)], that when it "decides a case and no

**(Footnote continued on next page…)**

MHW - 3

There is no dispute that the voters who cast the questioned 261 ballots were qualified, registered electors. Moreover, there is no allegation that any of the 261 voters in question had voted more than once. Importantly, there is no allegation that the subject 261 ballots were not received by the Board prior to the deadline for receipt on Municipal Election Day. In fact, it is beyond dispute that each challenged ballot was received by the Board by 8:00 p.m. on Municipal Election Day. The only sin that would lead these votes to be discarded is that the qualified, registered voters failed to either enter a date, or properly enter a date, on the declaration portion of the ballot's outer envelope. I would agree that an entirely blank declaration properly would be discarded, as there would be no confirmation that the ballot is genuinely that of the registered elector. This result would ameliorate purported voter fraud, which is not at issue here.

I view the requirement of a voter-inserted date on the declaration as similar to the issue of the color of ink that is used to fill in the ballot. As outlined above, Section 1306-D(a) of the Election Code plainly states that the voter "***shall***,

---

**(continued…)**

> single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . ." *Id.* at 193[] (quotation marks and citation omitted). We apply the *Marks* rule. *See Commonwealth v. McClelland*, [233 A.3d 717, 731 (Pa. 2020)] (applying *Marks*).

*Commonwealth v. Alexander*, 243 A.3d 177, 197 (Pa. 2020). Because Justice Wecht did not apply the "weighty interest" or "materiality" analysis in his Concurring and Dissenting Opinion in *In re Canvass of Absentee and Mail-In Ballots of November 3, 2020 General Election*, the Majority errs in determining that that opinion, in conjunction with the Concurring and Dissenting Opinion of Justice Dougherty applying this analysis, constitutes a "holding" of the majority of that Court in that case that is applicable to the facts of this case. This is simply an incorrect application of the *Marks* rule.

MHW - 4

in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen." 25 P.S. §3150.16(a) (emphasis added). Our Supreme Court approved the marking of absentee ballots with green or red pen to be appropriate despite the General Assembly's use of the word "shall" when describing the method of marking the ballots. *See In re Luzerne County Return Board*, 290 A.2d 108, 109 (Pa. 1972). There, our Supreme Court construed the Election Code liberally so as to not disenfranchise Pennsylvania voters over a technicality. In light of the foregoing criteria, I would do so here as well, and I would not blithely disenfranchise those 261 voters who merely neglected to properly enter a date on the declaration of an otherwise properly executed and timely-submitted ballot.

Accordingly, unlike the Majority, I would affirm the trial court's order in this case.


_____
MICHAEL H. WOJCIK, Judge